**1010 POTOMAC ASSOCIATES and John H. Safer, Appellants,**

**v.**

**GROCERY MANUFACTURERS OF AMERICA, INC., and Seymour, Seefried & Hoffman, Chartered, Appellees.**

**No. 81–1274.**

District of Columbia Court of Appeals.

Argued Nov. 2, 1982.

Decided Dec. 14, 1984.

As Amended Dec. 20, 1984.

**202**

J. Jonathan Schraub, Washington, D.C., for appellants.

Mark H. Tuohey, III, Washington, D.C., with whom Paula M. Connelly and Shelby D. Green, Washington, D.C., were on brief, for appellee Grocery Manufacturers of America, Inc.

Timothy J. Bloomfield, Washington, D.C., for appellee Seymour, Seefried & Hoffman, Chartered.

Before NEWMAN * and TERRY, Associate Judges, and WERTHEIM, Associate Judge, Superior Court of the District of Columbia.**

WERTHEIM, Associate Judge:

In this action between a commercial landlord and its trade association tenant, the landlord appeals from a mandatory injunction requiring specific performance of the landlord's obligation to consent to a sublease. The dispute centers on the tenant's right to exercise an option to lease additional space and then sublet all the additional space to a third party at a rate double that payable under the prime lease. Relying upon a clause in the lease permitting subletting only with the landlord's consent, which may not "unreasonably" be withheld, the landlord contends that the lease's option and subleasing provisions were not intended to permit the tenant to enter into the real estate business in competition with the landlord by "flipping" the option and subleasing for economic gain in this manner. It is undisputed that the subtenant was otherwise unobjectionable and that the landlord was itself prepared to offer the same space to the same subtenant at the higher rate. Errors are asserted in the trial court's construction of the lease, in its consideration of parol evidence of the parties' intentions, in the admission of evidence of a pre-litigation offer by the landlord to split the sublease profit with the tenant, and in the grant of equitable relief without an adequate showing of irreparable injury. We affirm.

I

In the fall of 1977, appellee Grocery Manufacturers of America, Inc. (GMA), a national trade association, was seeking new quarters for its District of Columbia offices. At that time GMA occupied 7,800 square feet at 1425 K Street, N.W., but desired about 10,000 square feet to meet both its current needs and the need for additional space for future growth and expansion. The local supply of available commercial space then exceeded demand, creating a "soft" real estate market. Among the buildings with substantial space available was the Waterfront Center at 1010

* Associate Judge Kelly was a member of the division that heard oral argument. After she retired from the court on March 31, 1983, Judge Newman was chosen by lot to replace her.

** Sitting by designation pursuant to D.C.Code § 11–707 (1981).

Wisconsin Avenue, N.W., in Georgetown, then owned by the predecessors in interest of appellants 1010 Potomac Associates (Potomac), a limited partnership, and its general partner John H. Safer. Only three of the eight floors of the Waterfront Center had then been leased; the landlord expressed a strong desire to lease an entire floor to a suitable corporate tenant such as GMA.

The eighth floor of the Waterfront Center contained about 16,000 square feet. GMA proposed to lease, for an initial term of ten years with a renewal term of an additional five years, 12,000 square feet of the eighth floor with options to take the remaining space on that floor in two segments of 2,000 square feet each at the end of the fourth and seventh years.[1] Although the additional 4,000 square feet exceeded GMA's anticipated needs, the options would permit GMA to utilize more space itself if needed and, through subleasing, to control the quality of its neighbors.[2] Cognizant that the half-empty building had been completed more than a year earlier and needing longer-term financing, the landlord insisted that GMA take a single

option for the entire 4,000 square feet of additional space exercisable at the end of the third year, because the landlord "needed a full floor tenant, he needed to walk into his insurance meeting having something—a lease in hand that showed GMA was a full floor tenant."[3]

GMA agreed to this, and the lease was executed accordingly on November 29, 1977, providing for annual rental payments of $12 per square foot for the initial 12,000 square feet of space.[4] The option for GMA to acquire the remainder of the eighth floor after three years, also at $12 per square foot, as drafted by the landlord, was subject only to the condition that GMA not be in default at the time the option was exercised.[5]

The subleasing clause, contained in a printed lease form furnished by the landlord, provided in Paragraph 5 that GMA could sublet or assign "the demised premises or any part thereof" only with the prior written consent of the landlord, "which consent shall not be unreasonably withheld." Paragraph 32 of the lease reflected GMA's concern for the quality not only of

---

1. More precisely, the initial space was 12,244 square feet and the remaining space 3,970 square feet.

2. GMA was concerned that its employee recruiting not be retarded by conditions of "porno shops and prostitutes right outside the door" as at its former location just off Fourteenth Street, N.W., and that "head shops and that sort of thing" not become neighboring tenants in the Waterfront Center. Trial Transcript (hereafter Tr.) 37–38, 148–150.

3. Tr. 95. *See also* Tr. 35–36.

4. The landlord gave GMA substantial concessions in order to have the $12 figure appear in the lease for the initial space, including a credit against rent of $3.50 per square foot for construction costs to be absorbed by the landlord (Paragraph 37 of the lease), so that the landlord could present prospective lenders with a lease at that seemingly high rate. Tr. 35.

5. Paragraph 30 of the lease stated in pertinent part:

Provided Tenant is not in default under the terms of this Lease, Tenant shall have an *option to lease the balance of the Eighth floor*

consisting of approximately 3,970 square feet after the third year of the term of this lease for the remainder of the term hereof. If Landlord shall have leased said area to another tenant or tenants, Landlord shall have the right to defer delivery of possession of the premises to a date not later than Forty-two (42) months from the commencement date of this Lease. In order to exercise said option, Tenant must give to Landlord on or before Ninety (90) days prior to the expiration of the third year of the term hereof written notice of its exercise of said option. Tenant agrees to take the premises in "as is" condition, or Landlord will provide Building Standard if *the expansion area* has not previously been finished by Landlord for another tenant.

In the event Tenant exercises *said option to expand,* the rent for the 3,970 square feet shall be $3,970.00 plus the accumulated pro rata share of operating expenses of the Building as defined in Section 1. [Emphasis supplied.]

The lease term was originally to commence April 1, 1978, but actual commencement was delayed until June 11, 1978.

its immediate eighth floor neighbors but of all other tenants in the building:

> ... [T]he Landlord agrees he will not lease retail space in the building to businesses which would tend to impair the reputation of the building or its desirability as a building for offices or organizations such as Tenant, nor will Landlord lease retail space in the building to businesses which are or encourage disorderly or unlawful conduct, including, but not limited to, massage parlors, pornographic stores or stores selling items customarily used in conjunction with illegal activities.

There is no dispute that the option granted by Paragraph 30 of the lease was exercised by GMA in a timely manner in February 1981, and that proper notice was given to appellants Potomac and Safer, who by then had succeeded to the landlord's interest. Both before and after exercising its option, GMA sought unsuccessfully to find a subtenant for part of the option space for a two- to three-year period and for that purpose showed the additional space with Potomac's consent to several prospective subtenants, including appellee (intervenor below) Seymour, Seefried & Hoffman, Chartered (Seymour), a law firm specializing in antitrust litigation. Seymour concluded that it needed all of the option space for its business operations and that it desired a long-term lease for the entire remaining six and one-half years of GMA's initial lease term, due to the substantial investment required on Seymour's part in fixturing the premises.

GMA and Seymour then negotiated, and on June 11, 1981, GMA submitted to Potomac for its consent, a sublease of the entire 4,000 square feet of GMA's option space commencing November 1, 1981, for the balance of GMA's initial term at an annual sublease rental of $24 per square foot. In reliance upon the sublease, Seymour negotiated the termination of its current office lease effective October 31, 1981, and began steps to prepare the option space at the Waterfront Center for its occupancy.

Within a few weeks Potomac's attorney, at a meeting with GMA's general counsel, advised GMA that Potomac and Safer were willing to consent to the sublease only if GMA would split with them the differential in rent due under the prime lease and the sublease. When GMA declined this offer, Potomac and Safer by letter dated August 6, 1981, refused to consent to the proposed sublease and asserted that GMA's option under Paragraph 30 was limited to GMA itself "expanding" into, rather than subletting, the additional space. However, appellants then stated their intention to offer the same space to Seymour on the same terms and conditions as GMA had offered.

GMA thereupon commenced this action seeking a declaratory judgment, specific performance, and preliminary and permanent injunctive relief. Seymour was granted leave to intervene as a party plaintiff. After a hearing, the trial court denied GMA's application for a temporary restraining order, and thereafter it ordered the trial on the merits to be advanced and consolidated with the hearing on appellee's motion for preliminary injunction. The evidence at trial included testimony of GMA's officers and brokers who participated in the 1977 lease negotiations and that of appellant Safer, who freely acknowledged that the sole basis for appellants' withholding of consent to the sublease was "essentially economic in nature."

Judge Revercomb found the lease terms to be unambiguous and the phrase "option to expand" in Paragraph 30 to mean an option to expand the demised premises subject to the lease rather than, as Potomac and Safer contended, an option only to expand GMA's own business operations into the additional space. Reasoning that the sublease fully protected the landlord's bargain under the prime lease and that Potomac and Safer were not entitled to improve upon that bargain, Judge Revercomb concluded that unstated economic conditions cannot be used by the landlord as a basis for withholding consent to an otherwise valid sublease. The trial court therefore

entered judgment in favor of GMA and Seymour and, upon finding that Seymour would suffer irreparable harm absent injunctive relief, enjoined appellants from withholding their consent to the sublease. The court further ordered appellants immediately to execute written consent to the sublease. This appeal followed.

## II

Appellants (referred to jointly as "landlord") contend that the lease did not entitle GMA to exercise its option for additional space and then immediately to sublet the entire option space for the balance of GMA's initial lease term to a third party for profit, and that the landlord therefore did not act unreasonably in withholding consent to the sublease to Seymour. The landlord asserts that the trial court's contrary conclusion was based on an erroneous factual finding as to the intent of the parties to the lease. However, the trial court made no such factual finding; as the landlord concedes, the trial court found no ambiguity in the lease. It is clear that the landlord's disagreement is not with any finding of fact but rather with the trial court's interpretation of the lease as a matter of law.[6]

■■■■ Since the interpretation of an integrated contract is a question of law unless it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, *International Brotherhood of Painters v. Hartford Accident & Indemnity Co.*, 388 A.2d 36, 43 (D.C.1978); *1901*

*Wyoming Avenue Cooperative Ass'n v. Lee, supra* note 6, 345 A.2d at 461 n. 8; RESTATEMENT (SECOND) OF CONTRACTS § 212(2) (1981), and no party contends that interpretation is so dependent in this case, we review the trial court's construction of the lease to determine whether it was erroneous.

## A.

■■■■ The first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant. *Intercounty Construction Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982). The meaning must be ascertained in light of all the circumstances surrounding the parties at the time the contract was made. *Id.;* RESTATEMENT (SECOND) OF CONTRACTS §§ 202(1), 212(1) (1981). The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms. *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, at 366 (D.C.1984); *Davis v. Davis*, 471 A.2d 1008, 1009 (D.C. 1984); RESTATEMENT (SECOND) OF CONTRACTS §§ 202(2), 203(a) (1981). If the document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent. *Bolling Federal Credit Union v. Cumis Insurance Society, Inc.*, 475 A.2d 382, 385 (D.C.1984). Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous. *Id.; Davis v. Davis, supra*, 471 A.2d at 1009. However, extrinsic evidence may be considered to determine the circumstances sur-

---

**6.** Appellants have challenged none of the trial court's specific findings of fact. Their general characterization of the issue as one of fact as to the parties' intent misconstrues the trial court's clearly expressed findings and conclusions and obscures the distinction we have long ago noted in the context of contract interpretation:

Analytically, of course, the question of what the parties intended is clearly a question of fact. But the courts have long called it a question of law. The reason is not that it is a question of law in the literal sense ... but ... that the judge is better qualified than the jury to interpret the written language. The courts

make the determination on practical grounds as to whether the question should be decided by the judge or the jury, and then they put the label on accordingly. What for practical reasons is assigned to the judge is called a "question of law" and what for practical reasons is assigned to the jury is called a "question of fact."

*1901 Wyoming Avenue Cooperative Ass'n v. Lee*, 345 A.2d 456, 461 n. 8 (D.C.1975), *quoting* 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 30.02 at 197 (1958). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 212 comment d (1981).

rounding the making of the contract, *Inter-county Construction Corp. v. District of Columbia, supra,* 443 A.2d at 32; *In re Estate of Russell,* 69 Cal.2d 200, 209–212, 444 P.2d 353, 359–361, 70 Cal.Rptr. 561, 567–569 (1968) (en banc); RESTATEMENT (SECOND) OF CONTRACTS § 212 comment b (1981); 4 WILLISTON ON CONTRACTS § 610A at 517–519, § 629 at 918–919, 923–925 (3d ed. 1961),[7] so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant. *See District of Columbia Department of Housing & Community Development v. Pitts,* 370 A.2d 1377, 1380 (D.C. 1977); *Pennsylvania Avenue Development Corp. v. One Parcel of Land,* 494 F.Supp. 45, 49 (D.D.C.1980).[8]

■ According to the landlord, Paragraph 30 of the lease, in granting GMA an option to lease the balance of the eighth floor, was intended only, or at least primarily, to enable GMA to utilize that additional space for expansion of GMA's own business operations. Although no such limitation was expressed in the terms of the lease itself, which conditioned the option only on the requirement that the lease not be in default at the time the option is exercised, the landlord relies for this interpretation on the phrase "said option to expand," which appears in the final sentence of Paragraph 30 (as set forth in the margin at note 5, *supra*). This phrase, it is contended, imports a qualification on the option itself, denoting that the option was intended only for expansion of GMA's own operations.[9] Moreover, the landlord argues that the lease as a whole cannot reasonably be construed to allow GMA to exercise its combined option and subleasing rights so as to compete with the landlord by utilizing all the option space to profit from a sublease.

Looking first to the express terms of the contract itself, we find nothing in the lease to support the meaning which the landlord attributes to the phrase "said option to expand." The term "said" in that phrase indisputably refers to the option terms more fully set forth in the immediately preceding paragraph of Paragraph 30, where the option is particularly described as an "option to lease the balance of the Eighth floor consisting of approximately 3,970 square feet," and is made subject only to the proviso that GMA not be in default. The landlord's effort to graft the second paragraph's shorthand phrase "option to expand" onto the first paragraph's more complete description of the option, as an otherwise unexpressed condition of that option, would produce a strained and obscure reading of that phrase. Since all of Paragraph 30 is identified in the left margin of the lease's first page as an Addendum to Paragraph 1 describing the "Premises," and Paragraph 30 itself refers to the option space as "the expansion area" in the sentence immediately preceding the phrase "said option to expand," we think the trial court was plainly correct in interpreting the phrase "option to expand" as an option

7. The Restatement emphasizes that whether a contract is integrated or not, its meaning must be determined "in the light of the circumstances" at the time the contract was made. RESTATEMENT (SECOND) OF CONTRACTS §§ 202(1), 212(1) (1981).

8. To the same effect, *see* RESTATEMENT OF CONTRACTS § 230 comment a (1932). We noted in *1901 Wyoming Avenue Cooperative Ass'n v. Lee, supra,* 345 A.2d at 461 n. 9, that the Second Restatement in its 1973 tentative draft adopted essentially this standard with respect to all contracts, whether ambiguous or not.

9. There is no claim by the landlord, however, *that* the alleged qualification was an additional term rendering the lease as executed less than a completely integrated agreement. To be successful, such a claim would require the additional term to be consistent with the written agreement and either to have been agreed to for separate consideration or to be such a term as in the circumstances might naturally have been omitted from the writing. RESTATEMENT (SECOND) OF CONTRACTS § 216 (1981). A provision restricting use of property would ordinarily be expected to be included in a written instrument of conveyance. *See McCarthy's St. Louis Park Cafe, Inc. v. Minneapolis Baseball & Athletic Ass'n,* 258 Minn. 447, 455, 104 N.W.2d 895, 901 (1960).

to expand the demised premises subject to the lease.

This conclusion becomes all the more compelling when the remaining terms of the lease are taken into account, as they must be in construing the lease as a whole. If the "expansion area" referred to in Paragraph 30 is not descriptive of the demised premises which are subject to all of the general lease provisions, including the broad subleasing authority of Paragraph 5, then uncertainty would be introduced as to the applicability to that area of numerous other general provisions such as "Use of the Premises" (Paragraph 3),[10] "Upkeep of Premises" (Paragraph 4), "Fire Insurance" (Paragraph 6), and "Alterations" (Paragraph 7). Furthermore, under the landlord's interpretation uncertainty would arise also as to the scope of the restriction on GMA's subleasing authority, for the landlord agrees that the lease permits GMA to sublet a portion of the option space or even to sublet all of that space for a portion of the lease term, precluding only the subletting of all the space for the entire balance of the term. The landlord also conceded at oral argument that the lease permits GMA to occupy the option space itself and then to sublet at a profit an equivalent 4,000 square feet of its original leasehold space for the balance of its term, at least so long as GMA does not do so as a pretext for competing with the landlord in the real estate business. How a prospective subtenant could know with any assurance whether the prime lease prohibits or authorizes a sublease under those conditions is not suggested by the landlord.

 Absent any language in the lease itself which limits any sublease to a specific time period, business purpose, or portion of the demised premises, the landlord's interpretation would leave the rights of GMA and its subtenants too uncertain to be predictable with any reasonable degree of business security. An interpretation of the lease that so imperiled the security of commercial transactions dependent on it would not give reasonable and effective meaning to all the lease terms. *See Vicki Bagley Realty, Inc. v. Laufer, supra,* at 366. Not only does the lease contain no language warranting such an interpretation, but none of the circumstances surrounding its execution suggest that any such ill-defined restriction on GMA's subleasing authority was contemplated by either party.[11] GMA bargained for rights to the entire eighth floor in order to control the quality of its neighbors as well as to have space available for its own future needs, which were not anticipated to exceed the initial 12,000 square feet; the landlord bargained for a suitable tenant who would assume obligation for the entire floor.[12] Neither those objectives nor the circumstances of the parties at the time reasonably support any interpretation of the lease terms as conditioning GMA's right to sublet on any requirement other than that of securing the landlord's consent, which was not to be unreasonably withheld.

The landlord's reliance on *Gilbert v. Van Kleeck,* 284 App.Div. 611, 132 N.Y.S.2d 580, *motion to modify denied,* 284 App. Div. 857, 134 N.Y.S.2d 193 (1954), is misplaced. In that case a lease giving the tenant a right of first refusal to purchase both the demised premises and the entire

---

**10.** Paragraph 3 of the lease provides that "[t]he Tenant shall use and occupy the demised premises for offices and for no other purpose whatsoever without the prior written consent of Landlord." The landlord does not claim that this provision prevents use of sublet space as offices by persons other than GMA; such a reading would negate completely the subleasing authority of Paragraph 5. Clearly, it is only the character of the use, *viz.,* for "offices" and not for some other purpose, that is restricted by Paragraph 3.

**11.** Extrinsic circumstances surrounding the execution of a contract may be considered only to aid in determining the meaning of the contract, not to alter its terms. *Soldano v. Holmes,* 60 A.2d 535, 537 (D.C.1948); 4 WILLISTON ON CONTRACTS § 610A at 518–521, § 629 at 923–925 (3d ed. 1961).

**12.** *See* text at notes 2 and 3, *supra.*

parcel of which those premises were a part was held not to permit the tenant to assign that right to one party and to assign the lease itself to yet another party, in the absence of a contrary expression of inten-. tion by the original parties. The court reasoned that such separate assignments of the leasehold and first refusal interests would defeat the purposes of the first refusal right, which were to protect the lessee's interest in continued possession of the premises and to encourage the lessee to make improvements. The facts here are quite different. GMA has not assigned either its lease or its option to Seymour, but has merely exercised its express right under the lease itself to sublet "the demised premises or any part thereof," subject to the landlord's reasonably granted consent. GMA as prime tenant remains liable to the landlord for the lease payment on the entire eighth floor; there is no severance of the leasehold and option interests. Moreover, it is GMA, not Seymour, that retains the right to extend the term of GMA's lease of the entire floor for an additional five years.

■ We have no doubt that the trial court was correct in concluding that the option clause unambiguously entitled GMA to expand the demised premises and to utilize all or any part of those premises for any purpose permitted by the remaining provisions of the lease, and that the subleasing clause qualified GMA's right to sublet only by the requirement of the landlord's consent, which was not to be unreasonably withheld. Nothing in the lease prohibited GMA from exercising those contract rights as it did here. The landlord's contrary assertion is not a reasonable interpretation of the lease.

### B.

Having concluded that the lease itself did not prohibit GMA's sublease to Seymour, we next consider whether the trial court erred in determining that the landlord breached its lease obligation not to act "unreasonably" in refusing to consent to the sublease.

■ The trial court found that the landlord's refusal was based on economic considerations, *i.e.*, the landlord's desire to improve upon the rental bargain negotiated in the prime lease so as to share in the benefits of the substantially increased market value of the premises. This finding is amply supported by the evidence. During the months preceding GMA's submission of the proposed sublease to the landlord in June 1981, the landlord was on notice that GMA contemplated a sublease of the option space[13] and cooperated by arranging for Seymour to visit the expansion area on several occasions. The landlord raised no objection until late June 1981, when the landlord insisted that GMA split with the landlord the rent differential between the prime lease and the sublease as a condition of the landlord's consent. It was only after GMA rejected this offer that the landlord, for the first time, asserted in its letter of August 6, 1981, that the lease prohibited the proposed sublease. The landlord then admitted that Seymour was an entirely suitable subtenant by offering to lease the option space directly to Seymour on the same terms GMA had negotiated. Moreover, appellant Safer in testifying before the trial court admitted that his sole reason for withholding consent to the sublease was economic. On this record the trial court could hardly have reached any different conclusion.

■ The question of whether a landlord's consent to a sublease may reasonably be withheld for economic advantage has apparently not been considered previously in this jurisdiction. However, the other jurisdictions of which we are aware that have addressed a similar question

---

**13.** Moreover, the landlord was on notice as early as July 1980 that GMA intended to exercise the option in 1981 and either expand into part of the space or sublease it. At that point, appel-lant Safer suggested that GMA exercise the option a year early, in return for a rental increase, and offered to refer prospective subtenants to GMA. Tr. 102–105.

have all concluded that a landlord may not for economic motives reasonably refuse consent to a sublease that fully protects the landlord's bargain under the prime lease. *See Bedford Investment Co. v. Folb*, 79 Cal.App.2d 363, 180 P.2d 361 (1947) (refusal to consent unless tenant splits sublease profit is arbitrary); *Krieger v. Helmsley-Spear, Inc.*, 62 N.J. 423, 302 A.2d 129 (1973) (unreasonable to withhold consent because landlord would lose proposed subtenant as tenant in another building); *Ringwood Associates, Ltd. v. Jack's of Route 23, Inc.*, 153 N.J.Super. 294, 379 A.2d 508 (unreasonable to withhold consent where landlord offers to lease directly to proposed subtenant at higher rent), *aff'd*, 166 N.J.Super. 36, 398 A.2d 1315 (App.Div. 1977); *see also Moore v. Bannister*, 269 So.2d 291 (La.Ct.App.1972) (unreasonable to withhold consent where subtenant is reputable and uses premises for same business as lessee at more than double lessee's rent); *Filmways, Inc. v. 477 Madison Avenue, Inc.*, 36 A.D.2d 609, 318 N.Y.S.2d 506 (1971), *aff'd*, 30 N.Y.2d 597, 282 N.E.2d 119, 331 N.Y.S.2d 31 (1972) (no reasonable basis for withholding consent where landlord will receive every benefit of each provision of prime lease).[14]

The landlord argues that its offer to split the sublease rent differential was irrelevant.[15] On the contrary, it was highly relevant as probative of the landlord's reason for refusing to consent to the sublease.

See *Bedford Investment Co. v. Folb*, supra.

■ The landlord also seeks to distinguish *Ringwood Associates, Ltd. v. Jack's of Route 23, Inc.*, supra, on the theory that the tenant in that case had outgrown the premises and thus risked forfeiting the lease if not allowed to sublet, whereas GMA had no obligation to exercise its option for additional space which it did not need. However, GMA had already obligated itself for the option space by notice to the landlord before it proposed the sublease to Seymour. Had GMA not timely exercised its option to acquire the entire expansion area at the end of the third lease year, pursuant to the option clause demanded by the landlord's predecessor in interest in the original lease negotiations (despite GMA's preference for staggered options at the end of the fourth and seventh lease years),[16] GMA would have lost its right to control the option space not only for the balance of its current ten-year lease term but also for its prospective five-year renewal term. GMA was thus in essentially the same position as the lessee in *Ringwood* since, as the landlord concedes, there is no credible legal distinction between allowing a sublet for space which has become too small for business and allowing a sublet for space which is too large.[17]

■ We agree with the California and New Jersey courts in *Bedford Invest-*

14. So long as the proposed subtenant is suitable by objective criteria pertinent to acceptability by any landlord and will use the premises lawfully and otherwise consistently with the lease terms, the landlord also may not refuse consent on subjective grounds such as philosophical or ideological differences with the subtenant. *American Book Co. v. Yeshiva University Development Foundation, Inc.*, 59 Misc.2d 31, 297 N.Y.S.2d 156 (Sup.Ct.1969).

15. We address in Part IV, *infra*, the landlord's contention that the offer was inadmissible as an offer to compromise a claim.

16. *See* text at notes 1–3, *supra*.

17. The landlord attempted to avoid this result by unilaterally promising, in its letter to GMA dated August 6, 1981, to provide the option space to GMA at the end of GMA's ten-year initial term under the same renewal provision that governed the remainder of GMA's space in the building. However, the promise was conditional on GMA's "needing" the space "for the purpose of expansion" at the end of GMA's initial term. Apart from denying GMA the full benefit of the option during the fourth through tenth lease years, this proposal would have imposed a condition on GMA's utilization of the option space during the renewal term which was not imposed by the existing option clause, as we have concluded in Part II.A, *supra*. The "promise," therefore, constituted merely an offer that GMA was free not to accept.

*ment Co.* and *Ringwood, supra,* that it is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position. The purpose of the consent clause is protection of the landlord in its ownership and operation of the particular property, not protection of the landlord's general economic condition. *Krieger v. Helmsley-Spear, Inc., supra.* The landlord has no reasonable basis for withholding consent if the landlord remains assured of all the benefits bargained for in the prime lease. *Filmways, Inc. v. 477 Madison Avenue, Inc., supra.*

▮▮▮ The landlord here was assured of the benefits of all the provisions of GMA's lease.[18] In refusing to consent to the sublease, the landlord sought merely to improve upon the bargain negotiated in the prime lease. The original negotiations having established the balance of risks accepted by both the landlord and GMA with respect to vicissitudes of the commercial real estate market, the landlord cannot reasonably demand that GMA alter that balance to the landlord's advantage and GMA's disadvantage as the price for the landlord's consent to a sublease to an admittedly suitable subtenant, under conditions that fully protect the landlord's bargain under the prime lease. The trial court correctly concluded that, on these facts, the landlord acted unreasonably in refusing to consent to the sublease.

### III

At varying times throughout the trial, the landlord objected to, or moved to strike, testimony of GMA's officers and brokers as to the course of the negotiations between GMA and the landlord's predecessor in interest prior to and surrounding the execution of the lease. The landlord characterized such testimony as parol evidence, arguing that it was inadmissible unless the lease terms were found ambiguous. At the conclusion of the trial, the trial court found that there was no ambiguity in the lease but denied the landlord's renewed motion to strike the testimony, ruling that the evidence was admissible not to show the parties' subjective intent but to illuminate the circumstances surrounding the negotiations.[19] The landlord assigns as error the denial of its motion to strike, contending that the trial court was required either to strike the testimony if the lease was unambiguous or to accede to the landlord's demand for a jury trial on the issue of the option and subleasing clauses' interpretation if an ambiguity existed warranting consideration of that testimony.

▮▮▮ Despite its name, the parol evidence rule is not a rule of evidence but a rule of substantive law defining the subject matter of interpretation. RESTATEMENT (SECOND) OF CONTRACTS § 213 comment a (1981). Its purpose is to promote the stability of transactions by preventing disgruntled parties from avoiding obligations by alleging oral understandings that conflict with their written agreements when those agreements were reduced to writing in order to forestall just such contentions. 2 MORGAN, BASIC PROBLEMS OF EVIDENCE 414 (1961); 4 WILLISTON ON CONTRACTS § 631 at 963 (3d ed. 1961).

▮▮▮ While courts have long described the rule as precluding such testimony except when the terms of the written contract are "ambiguous," *e.g., Dixon v. Wilson,* 192 A.2d 289, 291 (D.C.1963), a finding of no ambiguity may sum up several distinct determinations: that the contract was integrated, that the contract was complete, and that the oral term is inconsistent with the written agreement, is within its scope, does not bear on its interpretation, and would not naturally be omitted from the writing. RESTATEMENT (SECOND) OF CONTRACTS, Introductory Note to Chapter 9, at

---

18. The sublease to Seymour was expressly subject to the terms and conditions of GMA's lease.

19. Tr. 222, 266. *See also* Tr. 51–52 and ¶ 6 of the trial court's written Conclusions of Law. The substance of the testimony is summarized in Part I, *supra.*

81–82 (1981). Extrinsic evidence may properly be considered by the trial court in making each of these determinations, preliminary to a ruling on the applicability of the parol evidence rule. *Id.,* §§ 213–216. If the court ultimately concludes that the parol evidence rule prevents consideration of the evidence provisionally received, the trial court should then exclude it as immaterial to a decision on the merits. *Luther Williams, Jr., Inc. v. Johnson,* 229 A.2d 163, 165–166 (D.C.1967); *Rinaudo v. Bloom,* 209 Md. 1, 10, 120 A.2d 184, 190 (1956). The landlord urges that the trial court violated that principle in this case.

 However, the testimony which the landlord sought to strike was not evidence of any oral understanding in conflict with the written lease. Nor was it evidence of any oral statements by the parties of what they intended the words of the lease to mean.[20] Rather, it was evidence of the circumstances surrounding the making of the contract, and therefore admissible to show what a reasonable person in the position of the parties would have thought the contractual language meant. *Intercounty Construction Corp. v. District of Columbia, supra,* 443 A.2d at 32; *In re Estate of Russell, supra,* 69 Cal.2d at 209–212, 444 P.2d at 359–361, 70 Cal.Rptr. at 567–569; RESTATEMENT (SECOND) OF CONTRACTS § 212 comment b (1981); 4 WILLISTON ON CONTRACTS § 610A at 517–519, § 629 at 918–919, 923–925 (3d ed. 1961); *see General Elevator Co. v. District of Columbia,* 481 A.2d 116, 119 (D.C.1984). Because this evidence, although extrinsic to the writing, did not alter the subject matter of interpretation—the unambiguous terms of the lease—it was not precluded by the parol evidence rule. *See Soldano v. Holmes,*

*supra* note 11, 60 A.2d at 537. Accordingly, the trial court did not err in denying the motion to strike.[21]

## IV

Appellants' remaining contentions merit only brief discussion.

 The landlord asserts that its June 1981 offer to split the sublease rent differential with GMA was inadmissible as an offer to compromise. But the landlord made no objection when the evidence was presented, and appellant Safer then testified himself that the offer was indeed made with his approval. The landlord thus waived the protection of the exclusionary rule, if otherwise available, *Joyner v. Jonathan Woodner Co.,* 479 A.2d 308, 312 n. 5 (D.C.1984), and also failed to preserve the issue for appeal. Moreover, the offer was made before any controversy had arisen, two months before GMA initiated this action, and for that reason was not within the exclusionary rule. *Id.; Crain v. Allison,* 443 A.2d 558, 565 (D.C.1982). In addition, in *Auxier v. Kraisel,* 466 A.2d 416, 419–420 (D.C.1983), we held that when evidence of a settlement offer is introduced not as an admission of liability or to establish the amount of damages in the instant action, the traditional rule of inadmissibility is inapplicable. Here, the landlord's offer was admissible to show the reason for its refusal to consent to the sublease, *see* text at note 15, *supra,* and hence was not subject to the exclusionary rule.

 Lastly, the landlord contends that the harm to Seymour from the landlord's withholding consent to the sublease was wholly compensable by money damages and, in any event, would result only

---

**20.** Such evidence was declared inadmissible to show the meaning of the writing by RESTATEMENT OF CONTRACTS § 230 (1932), but is now declared admissible by RESTATEMENT (SECOND) OF CONTRACTS § 212(1) comment c (1981); *see id.,* Reporter's Note to Comment c.

**21.** In any event, no jury issue was presented because interpretation of the lease did not depend on the credibility of any of the extrinsic

evidence, none of which was disputed, or on a choice among reasonable inferences to be drawn from such evidence. *See International Brotherhood of Painters v. Hartford Accident & Indemnity Co., supra,* 388 A.2d at 43; *1901 Wyoming Avenue Cooperative Ass'n v. Lee, supra* note 6, 345 A.2d at 461 n. 8; RESTATEMENT (SECOND) OF CONTRACTS § 212(2) (1981).

from GMA's failure to sublet to Seymour, not from any conduct of the landlord, with whom Seymour had no contractual relation. As to the threatened harm to Seymour, the landlord does not challenge any of the trial court's factual findings, which included a determination that Seymour's inability to occupy the option space on schedule would have had a devastating impact upon its professional practice.[22] When real property is the subject matter of the agreement, the legal remedy of damages is assumed to be inadequate, since each parcel of land is unique; specific performance is warranted in such a case. *Flack v. Laster,* 417 A.2d 393, 400 (D.C.1980); *City Stores Co. v. Ammerman,* 266 F.Supp. 766, 776 (D.D.C. 1967), *aff'd,* 129 U.S.App.D.C. 325, 394 F.2d 950 (1968).

While it is true that the immediate source of harm to Seymour would be GMA's failure to perform its sublease obligations to Seymour, rather than breach of any direct obligation of the landlord to Seymour, a court of equity need not be blind to the realities of the situation. Seymour would be entitled to specific performance from GMA, and GMA would be entitled to specific performance from the landlord with respect to the identical sublease agreement. Since Seymour was a party intervenor as of right in this action, Super. Ct.Civ.R. 24(a), Seymour had the same right to complete and effective equitable relief that GMA had. *See Ross v. Bernhard,* 396 U.S. 531, 541 n. 15, 90 S.Ct. 733, 740 n. 15, 24 L.Ed.2d 729 (1970); *Marcaida v. Rascoe,* 569 F.2d 828, 831 (5th Cir.1978); *In re Raabe, Glissman & Co.,* 71 F.Supp. 678, 680 (S.D.N.Y.1947). *But see Kirkland v. New York State Department of Correctional Services,* 711 F.2d 1117, 1126 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104

S.Ct. 997, 79 L.Ed.2d 230 (1984).[23] In these circumstances, it was well within the trial court's equitable discretion to pierce the triangulated relationships among the parties and order relief directly for Seymour's benefit in one step rather than two.

*Affirmed.*

---

**22.** The landlord emphasizes its readiness to offer the same space to Seymour on the same terms that GMA had negotiated with Seymour. But this afforded no assurance of relief to Seymour, for the landlord could not validly offer Seymour what the landlord did not have, *i.e.,* the right to the option space after GMA had duly exercised its *option* for that space.

**23.** With the exception of minor alterations that are inconsequential here, FED.R.CIV.P. 24 is identical to Super.Ct.Civ.R. 24. *See Calvin-Humphrey v. District of Columbia,* 340 A.2d 795, 798 n. 11 (D.C.1975).