**QUADRANGLE DEVELOPMENT CORPORATION, a Delaware Corporation, et al., Appellants,**

v.

**Donald R. ANTONELLI, et al.**

No. 90–7176.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1991.

Decided June 18, 1991.

As Amended on Denial of Rehearing
Aug. 23, 1991.

Andrew H. Marks, Washington, D.C., for appellants.

Michael Nussbaum, with whom Bruce R. Grace was on the brief, Washington, D.C., for appellees.

Before RUTH BADER GINSBURG, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Quadrangle Development Corporation (Quadrangle) appeals from the district court's grant of summary judgment to appellees (partners in the law firm of Antonelli, Terry & Wands) and denial of its cross-motion for summary judgment in a landlord-tenant dispute involving the interpretation of the rent provisions of a lease. We agree with Quadrangle that it is enti-

tled to summary judgment and remand with instructions to grant Quadrangle's cross-motion.

## I.

Antonelli contracted with Quadrangle in 1977 to lease a floor of one of Quadrangle's office buildings for a ten-year period commencing in 1979 with an option to renew for two additional five-year terms. The rent during the initial period was to include a specified fixed rent plus a proportionate share of the increases after 1979 in the operating costs of the building.

The parties did not quickly agree on a provision governing the rent to be paid during the renewal terms. Quadrangle originally proposed a formula tying increases in rent during the renewal periods to the Consumer Price Index (CPI). But Antonelli objected and similarly rejected an alternative proposal that would have made rent during the renewal period a function of market rates. Instead, the parties ultimately agreed to terms under which rent during the renewal periods was a multiple of a figure combining the fixed rent in the original lease and Antonelli's share of the total increase, from 1979, in operating costs.

In 1988, Antonelli exercised its option to renew the lease for the first five-year term, only to find that it and Quadrangle disagreed as to what the rent would be. Their differences, though giving rise to a substantial disparity in total rent, were quite specifically focused. Antonelli maintained that it was not liable for a proportionate share of increases in operating costs over 1979 during the renewal period, whereas Quadrangle insisted Antonelli was. Quadrangle brought an action in district court seeking a declaratory judgment ratifying its interpretation of the lease and moved for summary judgment; Antonelli then filed a cross-motion for summary judgment. The district court held that the lease unambiguously supported Antonelli's position, both as a matter of the language of

the rent provisions and as a matter of "commercial reasonableness," and granted summary judgment in favor of Antonelli.

## II.

The disputed provisions of the lease are Article 23 dealing with operating costs and Article 40 explicitly covering renewal.

Article 23 reads in relevant part as follows:

[t]enant shall, for each calendar year after the Base Year [defined as the first year of the lease (1979)], pay to Landlord as additional rent [15.57%] ... of the increase (if any) in the Operating Costs of the Building ... for such calendar year over the Operating Costs of the Building for the Base Year.... In the event that the term of this Lease does not expire on December 31st, the amount payable by Tenant pursuant to this Article 23 with respect to its share of any increase in Operating Costs for the calendar year within which this Lease expires shall be determined by multiplying the amount of such share for the full calendar year by a fraction with the number of days during such calendar year prior to expiration of the term of this Lease as the numerator, and with 365 as the denominator.

And Article 40 states:

[t]he base annual rental for each of the renewal terms shall be adjusted to equal the base annual rental being paid at the time of the renewal including escalation pursuant to Article 23, multiplied by one and two tenths (1.2).

The question, then, is rather straightforward. Does Article 23 continue to operate during the renewal periods just as it did during the original lease term or does Article 40 implicitly terminate Article 23 because the "concept" of operating costs (in the form of the total amount at the end of original term) is dealt with in Article 40 as a factor in calculating the rent to be charged?[1] Quadrangle argues that the

---

**1.** If Article 23 does remain in effect during the renewal periods, it is clear that the rent must include all increases in operating costs commencing with the first year of the lease as opposed to the first year of the renewal period. The article speaks of "increase[s] in Operating

district court should have granted summary judgment for it rather than Antonelli because the lease plainly supports its interpretation. We agree.

 It is settled in the District of Columbia that the exercise of an option to extend a lease has "the legal effect of ... continu[ing] *all* the terms of the lease in force" absent any indication to the contrary. *Moiger v. Johnson*, 180 F.2d 777, 778 (D.C.Cir.1950) (emphasis added); *see also Crossman v. Fontainebleau Hotel Corp.*, 273 F.2d 720, 727 (5th Cir.1959); *Strano v. Reisinger Real Estate, Inc.*, 534 So.2d 1214, 1215 (Fla.App.1988); *cf. Worthington v. Serkes*, 111 A.2d 877, 878 (D.C. Mun.App.1955). We see no contrary indication in this lease. Certainly there is no direct linguistic tension between Article 23 and Article 40. The district court nonetheless thought that Article 23 does not survive. It reasoned that Article 23 itself suggests that its terms are limited to the original lease term because it refers to "the term of this Lease" without specifically mentioning the renewal periods. And it also stressed that Article 40 "does not ... provide for the continued application of Article 23," *Mem. Op.* at 4. But these observations fly in the face of the D.C. law on the effect of renewal on a lease's original terms.[2]

Indeed, we think Article 40 affirmatively indicates that Article 23 *is* to remain in effect during the renewals. Article 40 refers to "*base* annual rental"; this surely implies that something is to be added to produce a total rent. Yet under Antonelli's interpretation, the base rent for the renewal period and the total rent in each year of that period are one and the same. Were this the parties' intention, there would have been no need to use the term "base"—"annual rental" would have done nicely.

The real thrust of Antonelli's argument concerning the lease's language (and the contention which apparently persuaded the district court, *see Mem. Op.* at 5–6) is that Quadrangle's interpretation cannot be accepted because it causes the Article 23 cost pass-through for operating costs to be taken into account more than once. That is only superficially so, however. Article 40 appears to employ past operating costs increases as a proxy for an inflation escalator. That does not imply, let alone direct, that Article 23 does not retain its other (and in fact its most logical) function—passing through post–1979 operating costs increases—during the renewal periods. To be sure, the parties' treatment of past operating costs is unusual, perhaps even anomalous, but nothing precludes the parties from contracting in such a fashion. Indeed, it would perhaps be even more anomalous if the lease, which covers a period of up to twenty years and was entered into it at a time of high inflation, included no provision to protect the landlord from erosions in the value of the dollar. Antonelli's response to this point—that the 20% "bump" at the beginning of each renewal term was designed to serve as the landlord's sole protection against inflation—seems rather unconvincing. That would mean Quadrangle entered into a lease entitling it to only a 20% increase over the base year for years 10–15 and a 44% increase for years 15–20 to cover both loss in real receipts due to inflation *and* further increases in operating costs during the renewal periods when the value of the dollar, assuming annual inflation had held constant at, say, 5%, would have declined by about 39% by year 10, 52% by year 15 and 62% by year 20.[3]

Costs ... over the Operating Costs ... for the Base Year," and the lease elsewhere defines Base Year as the first year of the original term (1979).

**2.** Antonelli claims that the word "including" in Article 40 means that the sole function of Article 23 during the renewal periods is its role in the base rent formula. This is simply a non sequitur. Indeed, Antonelli's construction of "including" renders Article 40 internally inconsistent as applied to the second renewal: were Article 23

not to apply during the first renewal period, the calculation of the base rent for the second renewal period could not be a function of "the base annual rental being paid at the time of renewal *including escalation pursuant to Article 23*" but would simply be a function of the base annual rental during the first renewal period.

**3.** A low, and even an extremely low, CPI escalator could of course be explained if the original rent were well above the market rent at the time the original contract was made; in this way, the

We consequently view the lease as unambiguous. As the "language should be relied upon as providing the best objective manifestation of the parties' intent," it would appear that the district court granted summary judgment to the wrong party. *1010 Potomac Associates v. Grocery Mfrs. of America*, 485 A.2d 199, 205 (D.C.App. 1984). To be sure, under D.C. law "extrinsic evidence may [also] be considered to determine the circumstances surrounding the making of the contract" for the purpose of determining "what a reasonable person in the position of the parties would have thought" the language meant. *Id.* at 205–06. The district court based its determination in part on such evidence, reasoning that the parties intended a rent formula different from that created by the language of Articles 40 and 23 because Quadrangle's construction was not "commercial[ly] reasonable[ ]" in that it would result in Antonelli paying the highest renewal rent of any original tenant and close to 50% more rent than several other tenants. *See Mem. Op.* at 6–7.[4]

■ In our view, however, the district court mistakenly considered commercial reasonableness in hindsight (*ex post*) instead of commercial reasonableness "surrounding the making of the contract" (*ex ante*). *1010 Potomac Associates*, 485 A.2d at 205–206. During the rent negotiations in 1977 and 1979, Antonelli declined to tie rent increases to either the CPI or to the rental market. Perhaps if the inflation of the late 70's had continued Antonelli would be paying less than its neighbors. In any event, it is hardly open to the courts to rearrange the consequences of one party's unfortunate economic predictions through the interpretation of contracts.

We agree with the district court's assessment that the remaining extrinsic evidence is inconclusive (*see Mem. Op.* at 6 n. 9). As the terms of the lease fit Quadrangle's construction, we remand to the district court with instructions to grant Quadrangle's cross-motion for summary judgment.

*It is so ordered.*

lease would provide a front-loaded return. Antonelli, however, does not contend that the original rent was higher than average.

**4.** We note that Antonelli's interpretation would have it pay approximately 25% *less* than these same tenants (who are presumably paying the lowest rent in the building) for the second renewal.