DLY–ADAMS PLACE, LLC,
Appellant/Cross–
Appellee

v.

WASTE MANAGEMENT OF MARY-
LAND, INC., Appellee/Cross–Ap-
pellant.

Nos. 09–CV–40, 09–CV–129.

District of Columbia Court of Appeals.

Argued April 6, 2010.

Decided Aug. 5, 2010.

David C. Tobin, with whom Stephen J. O'Connor and Forrest G. Read, IV, Washington, DC, were on the brief, for appellant.

Philip T. Evans, Washington, DC, with whom Elizabeth L. Phelps, was on the brief, for appellee.

Before REID and KRAMER, Associate Judges, and KING, Senior Judge.

KRAMER, Associate Judge:

DLY–Adams Place ("DLY") sued Waste Management of Maryland, Inc. ("WMI") to prevent WMI from driving its garbage trucks through an alleyway on DLY's property. On appeal, we are asked to interpret a restrictive covenant and a forbearance agreement that arose out of a real estate transaction in which DLY bought real property, including the alleyway, from WMI. The trial court held that WMI did not reserve a right to use the alleyway when it sold the property to DLY, but that the forbearance agreement precludes DLY from taking any action to prevent WMI's use of the alleyway. We find no error and affirm.

## I. Factual Summary

WMI has operated a waste transfer station at 2160 Adams Place, Northeast since 1996. George Galich, the former general manager of DLY–Adams Place, owns property near WMI's facility and has objected to the operations of WMI since its facility opened. There is a history of litigation between the parties, as well as between WMI and other neighbors, including nuisance complaints regarding unwanted odors, vermin, rats, hazardous conditions, and heavy truck traffic in the neighborhood. In 1999, Galich and WMI reached a settlement, in which Galich agreed not to participate in any further action against WMI.

In 2005, Galich decided that he wanted to buy 2230 Adams Place, a property adjacent to the WMI facility. At the time, WMI leased 2230 Adams Place and retained an option to buy the property.

WMI agreed to buy the property and sell it to Galich. In December 2005, DLY, as a contract assignee of Galich, purchased 2230 Adams Place from WMI. As part of the sale, DLY and WMI executed a purchase and sale agreement ("PSA"), a deed of conveyance, and a forbearance letter. Each document contained a restrictive covenant addressing WMI's concern that Galich and DLY would interfere in its business operations. The covenant in the PSA provided: [1]

> Purchaser agrees and accepts that title to [2230 Adams Place] shall be conveyed to Purchaser by Seller subject to a restrictive covenant that runs with the land to the Property as described in the Deed, which restrictive covenant shall prohibit Purchaser from taking any direct or indirect action or inaction that would create, cause or otherwise result in any restriction on, or curtailment or cessation of Seller's business operations at its solid waste facility located at [2160 Adams Place]. . . .

In addition, the forbearance agreement, interpreted by the trial court as a covenant not to sue provided that:

> [B]y this letter, you agree . . . that you shall not take any direct or indirect action that would create, cause or otherwise result in any restriction on, or a curtailment or cessation of [WMI's] operation of its solid waste facility at [2160], whether as currently operated or may be operated, for so long as [WMI] determines in its sole discretion to operate that solid waste facility on that property.

Since at least 1996, tractor trailer trucks have used the alleyway between WMI's building and DLY's building at 2230

---

1. The covenants in each of the three transaction documents were worded slightly differently but each included the same basic promise by Galich and DLY to not interfere with the WMI's business operations.

Adams Place. DLY apparently did not realize that the alleyway was part of the 2230 Adams Place property at the time of the sale and the drafting of the transaction documents. But, about a year and a half after purchasing the building from WMI, DLY asked WMI to refrain from using the alley. WMI refused, and DLY brought this lawsuit for a declaratory judgment.

Both parties filed motions for summary judgment. After several hearings, Judge Thomas Motley entered an order granting in part and denying in part both motions. In essence, Judge Motley held that none of the transaction documents granted WMI an easement, or any other property right, to use the alleyway. Nonetheless, Judge Motley held that the forbearance agreement precludes DLY from taking any action to prevent WMI's use of the alley. The parties cross-appealed.

## II. Standard of Review

When reviewing the trial court's grant of a motion for summary judgment, we conduct an independent review of the record and apply the same standard as the trial court.[2] "We will affirm the trial court's decision if, viewing the evidence in the light most favorable to the non-moving party, 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'"[3] With regard to contracts, "[s]ummary judgment is appropriate where a contract is unambiguous since, absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence."[4] The determination of whether a contract is ambiguous is a question of law, which we review *de novo*.[5]

## III. Legal Analysis

To decide this case, we must interpret the restrictive covenant included in the Purchase and Sale Agreement as well as the forbearance agreement and determine how these documents interact. We begin with the restrictive covenant, and decide whether the covenant granted WMI an easement to use the alleyway.

### 1. The Restrictive Covenant Does Not Grant WMI an Easement

A restrictive covenant is "a private agreement used in a deed or lease, that restricts the use or occupancy of real property, especially by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put."[6] Basic rules of contract interpretation guide our analysis of the restrictive covenant at issue. In construing a contract like the PSA, we must determine "what a reasonable person in the position of the parties would have thought the disputed language meant."[7] We have held that "[i]f a deed is unambiguous, the court's role is limited to applying the meaning of the words."[8] Indeed, "[e]xtrinsic evidence of the parties' subjective intent may be resorted to *only* if the document is ambiguous."[9] "[A] con-

---

**2.** *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C.2009).

**3.** *Id.* (quoting Super. Ct. Civ. R. 56(c)).

**4.** *Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 422 (D.C.2006) (quoting *Washington Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 548 (D.C.2000)).

**5.** *Id.*

**6.** Black's Law Dictionary 393 (8th ed. 1999).

**7.** *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C.1984).

**8.** *Foundation for the Preservation of Historic Georgetown v. Arnold*, 651 A.2d 794, 796 (D.C. 1994) (citation omitted).

**9.** *1010 Potomac Assocs., supra* note 7, 485 A.2d at 205 (emphasis added).

tract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions of interpretations, or two or more different meanings." [10]

Here, the trial court found the language of the restrictive covenant in the PSA to be unambiguous. The judge held that "the plain language of each agreement does not indicate any intent at all on the part of WMI to reserve an express property right in the alleyway." We agree that the language of the restrictive covenant was plain and unambiguous.[11] See PSA text, *supra* Section I. Thus, we are "limited to applying" the words of the PSA and are prohibited from considering extrinsic evidence regarding the parties' intent.[12] Moreover, "[t]he general rule is that 'if [a] grantor intends to reserve any right over the tenement granted, it is his duty to reserve it expressly in the grant.' "[13] Thus, we are constrained to conclude that WMI did not reserve an easement to use the alleyway.[14]

Furthermore, WMI cannot claim an implied easement because the general rule is that "[t]here is no implied

reservation of an easement in case one sells a part of his land over which he has previously exercised a privilege in favor of the land he retains, *unless* the burden is apparent, continuous and strictly necessary for the enjoyment of the land retained." [15] While WMI may be able to show that the burden was apparent and continuous, it conceded that use of the alleyway is not necessary for the enjoyment of the neighboring property. Critically, the necessity requirement is only satisfied where "there could be no other reasonable mode of enjoying the dominant tenement without this easement." [16] This is clearly not the case here, where WMI conceded that there are other ways for its trucks to enter and leave the facility. As the trial court concluded, "[t]he fact that those other routes are less convenient is not sufficient to give defendant an implied easement in the alleyway."

## 2. The Forbearance Agreement Precludes DLY from Preventing WMI's Use of the Alleyway

Despite WMI's failure to reserve a right to use the alleyway, we agree with

---

10. *Curtis v. Gordon*, 980 A.2d 1238, 1243 (D.C.2009) (quoting *Washington Props.*, *supra* note 4, 760 A.2d at 548).

11. We are not persuaded by WMI's protestations that the broad language of the covenant should be read to encompass a right to use the alleyway, despite the lack of an explicit reference, because we find no ambiguity in the covenant to invite us to employ rules of construction or consider extrinsic evidence that would permit such a reading. Even if we were to find an ambiguity, we would be inclined to resolve it against WMI because we resolve ambiguities in a contract or covenant against the drafter of the instrument, WMI counsel in this case. *See Foundation for the Preservation of Historic Georgetown*, *supra* note 8, 651 A.2d at 797 ("[A]mbiguities in a deed will be resolved against the drafter of the instrument.") (citation omitted).

12. *Foundation for the Preservation of Historic Georgetown*, *supra* note 8, 651 A.2d at 796.

13. *Hefazi v. Stiglitz*, 862 A.2d 901, 913 (D.C. 2004) (internal quotation marks omitted) (quoting LEONARD A. JONES, A TREATISE ON THE LAW OF EASEMENTS § 127 (2003)).

14. WMI's argument that the transaction documents implicitly granted a license to use the alleyway fails for similar reasons. A license, like an easement, is a right over property which must be expressly granted. *See generally Hefazi*, *supra* note 13, 862 A.2d at 913.

15. *Hefazi*, *supra* note 13, 862 A.2d at 913 (quoting JONES, *supra* note 13, § 127) (emphasis added).

16. *Id.* (quoting JONES, *supra* note 13, § 156).

the trial court that the forbearance agreement constitutes a covenant not to sue, which "prevents DLY from taking any action whatsoever that would restrict WMI's business."[17] DLY challenges this conclusion, arguing that the trial court inconsistently construed documents which were contemporaneously executed as part of the same transaction,[18] that the trial court did not interpret the forbearance agreement in a way that reasonable persons in the parties' positions would have,[19] and that such an interpretation of the forbearance agreement leads to absurd results.[20] In essence, DLY contends that the trial court's interpretation of the forbearance agreement effectively grants WMI the easement which the court initially found was absent from the transaction documents.

We recognize the seeming incongruence of the conclusion that DLY owns the alleyway and possesses sole rights over the alleyway, but cannot assert those rights. Nonetheless, DLY, as a sophisticated commercial party on an equal playing field with WMI and a party to the drafting of the documents, cannot challenge the plain reading of the forbearance agreement simply because it does not like its effect. The forbearance agreement provided that DLY "shall not take any direct or indirect action that would create, cause or otherwise re-

sult in any restriction on, or a curtailment or cessation of [WMI's] operation of its solid waste facility ... for so long as [WMI] determines in its sole discretion to operate that solid waste facility on that property." We find these terms plain and unambiguous, and we decline to refer to extrinsic evidence to determine what DLY may have intended when it signed this agreement.[21] We disagree that a reasonable person in DLY's position would not have expected this result.[22] As the trial court found:

> At the time the contract was made, the parties already had a long history during which Galich and DLY made various types of efforts to curtail and restrict WMI's business. A reasonable person would conclude that this is precisely the reason the language in the Forbearance Letter was drafted so broadly. A reasonable person would also conclude that the use of the alleyway as exactly the type of contingency against which WMI sought to protect itself when it asked Galich and DLY to sign the Forbearance Letter.

Moreover, both parties acknowledged at the time of drafting and signing the transaction documents that the forbearance agreement was a concession by DLY. In

---

17. The trial judge held that this specifically prevented DLY from actions including "bringing a law suit [to enforce their ownership rights in the alleyway at 2230] or erecting a gate, etc., to prevent WMI from driving its trucks through the alleyway on DLY's property at 2230 because to do so would restrict WMI's business, something DLY has expressly agreed not to do."

18. *See* Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

19. *See Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C.1982) ("The

first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant.") (internal citations omitted).

20. *See* Restatement (Second) of Contracts § 203(b) (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

21. *1010 Potomac Assocs., supra* note 7, 485 A.2d at 205 (emphasis added).

22. *Id.*

exchange, WMI agreed to pay DLY $500 every month in consideration. In agreeing to the broad language of the forbearance agreement which expressly applied to current and future disputes, DLY assumed the risk that unanticipated disputes would arise and that they would be prevented from bringing suit.

Finally, the trial court's interpretation of the forbearance agreement was not inconsistent with its interpretation of the restrictive covenant. The judge observed that covenants not to sue are often drafted in broad, vague terms because they are "intended to cover both present and future conflicts between the parties,"[23] while "land agreements are required to meet specific and well-defined requirements." Thus, it is not contradictory to read the same language narrowly with regards to property rights and read it broadly with regards to the right to sue.

## IV.  Conclusion

Because the trial court correctly found the language of the restrictive covenant and the forbearance agreement unambiguous and properly interpreted the plain language of those documents, we affirm.

*Affirmed.*

---

**23.** The trial judge cited to *Syverson v. IBM Corp.*, 472 F.3d 1072, 1084 (9th Cir.2007) ("a covenant not to sue ... applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue") (citation omitted), as well as a treatise. 66 AM.JUR.2D RELEASE § 4 (2008) ("[a] covenant not to sue applies to future as well as present claims").