**George CHRISTACOS, Appellant,**

**v.**

**BLACKIE'S HOUSE OF BEEF, INC., Appellee.**

**No. 89–511.**

District of Columbia Court of Appeals.

Argued Sept. 18, 1990.
Decided Dec. 7, 1990.

Jonathan J. Goldberg, with whom Harry W. Goldberg and Thomas A. Gentile, Chevy Chase, Md. were on the brief, for appellant.

Richard T. Tomar, with whom Dimitri P. Mallios, Washington, D.C. was on the brief, for appellee.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

The primary question on this appeal is whether the principle that ownership of stock in a corporation is not ownership of an interest in the corporate assets may be applied so as to defeat the manifest intent of parties to an agreement. Specifically,

we must decide whether, when appellant sold 100% of the stock—but not the assets—of a closely held corporation to a third party, he triggered a provision in a previous agreement to pay an additional $50,000 to the person (appellee) from whom, in the name of the corporation, appellant had purchased a restaurant. In accordance with the trial court's findings as to the parties' intent, we answer the second question yes and hence the first question no. We therefore affirm the judgment in favor of appellee.

## I.

On July 22, 1983, appellant Christacos and appellee, Blackie's House of Beef, Inc. (Blackie's), entered into a written agreement of sale which provided that Christacos would purchase a bar and restaurant (then known as "The Black Beret" and later renamed "Christini's") located at 1140 Connecticut Avenue, N.W., for $300,000. Christacos agreed to pay Blackie's $100,000 in cash and the balance of $200,000 by means of a promissory note secured by a security agreement, payable in equal installments over five years. Before settlement, Christacos, with the consent of Blackie's owner, Ulysses Augur, formed a close corporation known as 1140 Connecticut Avenue, Inc.[1] As the trial court found, Christacos advised Augur that Christacos would hold the entire 3,300 outstanding shares of common stock. On October 25, 1983, a bill of sale was executed whereby Blackie's sold the business to 1140 Connecticut Avenue, Inc. The bill of sale incorporated the July 22, 1983 agreement of sale. Less than eight months after the October 25, 1983 closing, Christacos transferred all 3,300 shares of the 1140 Connecticut Avenue, Inc., stock to Nasser Zolfaghari for $75,000. Christacos did not inform Augur

of the transfer and did not have his consent to the transfer. Apparently by a separate agreement between Christacos and Zolfaghari, Christacos, his wife, and his cousin remained sole officers and directors of the corporation.

At the center of the dispute here is paragraph 2(d) of the agreement of sale between Blackie's and Christacos, which refers to the $200,000 promissory note and then states as follows:

> Said note shall be secured by a Financing Statement and Security Agreement in accordance with the Uniform Commercial Code of the District of Columbia on the items being sold, including fixtures, equipment, lease, licenses and replacements thereof. The Security Agreement securing said assets shall restrict the transfer of the assets being sold hereunder. *In the event that the Buyer desires to sell said business during the three-year period after settlement, and Seller is willing to consent to same, Buyer must pay to Seller the sum of $50,000.00 cash, in addition to the price called for herein, at the time he transfers ownership of said assets to another party.*[2] (Emphasis added.)

Christacos contends that the trial judge, as trier of fact in this bench trial, erred in finding that when Christacos sold 100% of the stock of 1140 Connecticut Avenue, Inc., he triggered the duty to make the additional $50,000 payment called for in paragraph 2(d). Appellant maintains that his sale of the 3,300 shares of the corporation's stock did not constitute a sale of the business and a transfer of its assets, and that therefore, the $50,000 extra payment provision was not activated.

In reaching a contrary conclusion, the trial judge credited the testimony of Ulys-

---

1. A close corporation or closely held corporation has "only a small number (for example, fewer than thirty) of individual shareholders ... whose shares are not traded on a recognized securities exchange or on the over-the-counter market." R. CLARK, CORPORATE LAW § 1.3 (1986). The corporation at issue here, 1140 Connecticut Avenue, Inc., in which all of the stock was held by one shareholder, fits this common definition of close corporations.

2. The October 25, 1983 security agreement includes a similar provision:

> [I]f said assets are sold and conveyed within three (3) years of the date hereof, the debtor shall pay the secured party the additional sum of Fifty Thousand ($50,000) cash at the time ownership of said assets is transferred to another party provided the transfer occurs within the aforementioned three (3) year period.

ses Augur that the purchase price of $300,000 was $50,000 below the fair market value of the restaurant at the time of sale and that the price was reduced in consideration of Christacos' owning and actively managing the restaurant for a period of three years after settlement. Specifically, Augur wanted Christacos, a veteran restauranteur, to remain the owner and on-premises manager to ensure Blackie's obligations to the landlord, Charles E. Smith Management, Inc., with whom Augur had a longstanding business relationship and to whom he would remain personally liable on the lease for five years. The trial judge found that Christacos was aware of the concerns of Augur in insisting on the $50,000 extra payment clause in case of a premature transfer, and that he understood and agreed to the obligations it imposed on him.

On these facts the trial judge concluded that the sales agreement was unambiguous and that Christacos' sale of 100% of the stock of 1140 Connecticut Avenue, Inc., to Zolfaghari was a sale and transfer of the "business" or "assets" within the meaning of paragraph 2(d):

> When defendant Christacos assigned his 3,300 shares to Mr. Zolfaghari, he relinquished all rights of ownership and control of the business. Mr. Zolfaghari, as the sole stockholder, had the right to dictate business policy, and, indeed, the right to divest himself entirely of the stock. The fact that defendant Christacos remained as president of the corporation is, neither in form nor function, the equivalent of ownership.

Having found the contract unambiguous in conditioning a transfer of ownership in this manner on Augur's consent and the payment of an additional $50,000, the judge declined to consider parol evidence offered by Christacos that, although he was not on the premises after the first year, he remained personally involved in operating the restaurant and made all payments on the promissory note in timely fashion, thus satisfying Augur's fundamental concerns.

## II.

■ Applying normal principles of contract interpretation, we hold that the trial judge was correct in finding that the provision for an additional payment was implicated by the sale of the entire stock of the corporation to Zolfaghari. "Fundamentally, when interpreting a contract, 'the court should look to the intent of the parties entering into the agreement.'" *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1093 (D.C. 1988) (citations omitted). Because "intent is properly an objective, not subjective, issue," *id.*, in determining the parties' intent the court looks to "what a reasonable person in the position of the parties would have thought the disputed language meant." *1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.*, 485 A.2d 199, 205 (D.C.1984). When "the document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent." *Id.* But as part of the reasonableness inquiry, this court recognizes "the presumption that the reasonable person knows all the circumstances surrounding the making of the contract," *Intercounty Construction Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C.1982). Therefore, although "[e]xtrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous[,] extrinsic evidence may be considered to determine the circumstances surrounding the making of the contract so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." *1010 Potomac Assocs.*, 485 A.2d at 205–06 (citations omitted).

■ Here, the trial judge found that the words of the contract, when read by a reasonable person placed in the situation of the parties, indicate without ambiguity that Christacos agreed to pay Blackie's $50,000 in addition to the original purchase price of $300,000 if Christacos sold or transferred the business within three years of the date of purchase.[3] The judge reached this con-

---

**3.** "[W]e treat the question of contractual interpretation, beginning with the question of ambi-

guity, as one of law," *Dodek*, 537 A.2d at 1093, and, hence, we make our own *de novo* determi-

clusion by properly considering the context in which the contract was formed. Although paragraph 2(d) of the agreement of sale uses both the words "business" and "assets," and in defining assets does not include the corporate stock, the judge found from the circumstances that the parties understood that sale of the entire stock of the corporation would be tantamount to sale of the business and transfer of its assets. Augur had specifically reduced the purchase price of the restaurant by $50,000 in return for Christacos' ownership and active management of the restaurant for three years, and Christacos understood that the extra payment provision triggered by the sale of the business was the means Augur had chosen to ensure this day-to-day supervision. The judge impliedly found that Augur had sold the restaurant to 1140 Connecticut Avenue, Inc., only because he knew that Christacos was the sole owner of the corporation.

Christacos argues, however, that reasonable, sophisticated businessmen could not have understood the provision to be triggered merely by transfer of the corporate stock without simultaneous conveyance of its assets—the "fixtures, equipment, lease, licenses and replacements thereof" referred to in the agreement. The reason for this is that, in general, the law differentiates between ownership of stock and ownership of the property of a corporation. As this court has explained in an unrelated context:

> [I]t is well established that because of the separate legal existence of a corporation, the corporate property is vested in the corporation itself and not in the stockholders.... Thus a corporation's property rights are entirely distinct from those of its shareholders.... The shareholder has essential rights to share in the

profits and in the distribution of assets on liquidation, but no specific interest in the corporation assets.

*Office of People's Counsel v. Public Serv. Comm'n of the District of Columbia*, 520 A.2d 677, 681–82 (D.C.1987) (citations and internal quotation marks omitted);[4] *see Rhode Island Hospital Trust Co. v. Doughton*, 270 U.S. 69, 81, 46 S.Ct. 256, 258, 70 L.Ed. 475 (1925) ("The owner of the shares of stock in a company is not the owner of the corporation's property"). Thus, according to Christacos, sale of the stock left the assets of the corporation exactly where they were originally, owned by the corporation of which he remained a director in charge of operations.

We decline, however, to allow this general rule divorcing ownership of stock from ownership of the corporate assets to defeat the intent of the parties to the agreement in this case. As the trial judge found, Augur bargained for an assurance that Christacos would continue to supervise the restaurant personally, and the parties understood that a sale of the business would jeopardize that assurance and activate the $50,000 payment by which the purchase price had been reduced. While the sale of the stock to Zolfaghari left the assets of the corporation nominally where they had been, it placed at risk the continued involvement of Christacos in the restaurant on which Augur had insisted. As the trial judge noted, Zolfaghari, as sole stockholder, acquired the right to dictate business policy and, indeed, to divest himself of ownership of the stock. Thus either he or a successor-owner could oust Christacos as both officer of the corporation and manager, bringing about the very alienation of control against which the additional payment was a hedge.[5]

---

nation of the correctness of the trial court's ruling. *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C.1990).

4. In *Office of People's Counsel*, we applied the distinction in holding that the owner of all the shares of stock in certain taxicab companies, but not of their trade names or identifying designs, was not an "owner" within the meaning of a statutory provision allowing such owner to establish a sinking fund in lieu of maintaining

insurance. Application of the distinction, besides being supported by the regulations of the Public Service Commission, served to facilitate recovery by victims of accidents caused by taxicab drivers, for reasons we explained in the opinion. 520 A.2d at 684–85.

5. The fact that, as appellant argues, Zolfaghari had expressly agreed that Christacos would remain in charge of operating the business and, along with his wife and cousin, the sole officers

In these circumstances, where Christacos sold the entire stock of a closely held corporation, it is important to bear in mind that the principle divorcing ownership of stock from ownership of the corporation is a "concept ... designed to serve normal, inoffensive uses of the corporate device, and is not to be stretched beyond its reason and policy." *Quinn v. Butz,* 166 U.S.App. D.C. 363, 377, 510 F.2d 743, 757 (1975) (footnote omitted). "[O]wnership of all the stock of a corporation normally carries with it effective, if indirect, ownership of the corporate assets...." *Wagner v. Wagner,* 466 Pa. 532, 537, 353 A.2d 819, 821 (1976); *see Camp v. Gress,* 250 U.S. 308, 320, 39 S.Ct. 478, 483, 63 L.Ed. 997 (1919) (owner of all capital stock of corporation could sue for damages in own name because that person was corporation's "equitable owner, with power to require an immediate conveyance of the legal title"). For this reason, courts have been unwilling to apply the distinction between stock ownership and ownership of corporate property when doing so would yield an unjust result.

For example, in *Sochet Securities, Inc. v. First Union Corp.,* 663 F.Supp. 1035 (S.D.Fla.1987), which involved construction of a Florida statute regulating the payment of commissions for the sale of "business enterprises" or "business opportunities," an issue was whether the sale of corporate stock constituted the sale of the business enterprise for purposes of determining whether a broker's fee must be paid. The court found, without further discussion, that "through its purchase of [seller's] stock, [buyer] purchased the entire ongoing business." *Id.* at 1037. In a similar case involving a broker's commission, the Supreme Judicial Court of Massachusetts elaborated on the point:

> The transfer of stock by [defendant] Haddad effected the sale of the corporate property for which [plaintiff] Morad had been employed to find a customer. The corporation was owned by Haddad.

It was used by him as an agency through which he conducted business. The sale of all of the stock of the corporation was in legal effect a sale of all of its assets, and the mere fact that the parties found it more convenient to transfer all of the stock rather than to make a conveyance of its assets does not change the substance of the transaction.

*Morad v. Haddad,* 329 Mass. 730, 735, 110 N.E.2d 364, 367 (1953).

■ Furthermore, the corporate form may not be used to shield from scrutiny a sham transaction, and in those cases where injustice results from the subterfuge, courts will disregard the division between a corporation and its shareholders. *Harris v. Wagshal,* 343 A.2d 283, 287 (D.C.1975). When the "separate corporate personality" is more apparent than real, "the courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." *Quinn v. Butz,* 166 U.S.App.D.C. at 378, 510 F.2d at 758 (quoting *Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n,* 247 U.S. 490, 500–01, 38 S.Ct. 553, 557, 62 L.Ed. 1229 (1918)).

To be sure, this case involves no issue of piercing the corporate veil. The trial judge made no finding that the sale of the entire stock by Christacos while leaving the corporation nominally intact was a device to evade the extra payment provision. We likewise find no reason to question appellant's motive. The trial judge, however, did not err in focusing on the substance rather than the form of the stock transfer and finding that the transaction effectively delivered ownership of the business and its assets to Zolfaghari. The transfer in turn activated Christacos' obligation to pay the additional $50,000.

and directors of the corporation, is beside the point. Even assuming Augur could have sued to enforce that agreement absent proof that the contracting parties intended to benefit him, *District of Columbia v. Campbell,* 580 A.2d 1295,

1302 (D.C.1990), the entire point of the additional payment provision was to spare Augur the need to resort to such measures for insuring Christacos' continued involvement in the restaurant.

We also reject the suggestion in appellant's brief that the judge unfairly declined to consider evidence that Christacos regularly made payments on the note—indeed paid it off—and remained involved in the restaurant after the sale to Zolfaghari, while admitting extrinsic evidence by Blackie's as to the parties' understanding in negotiating the extra payment clause. This suggestion reflects a confusion of legal principles. As stated earlier, extrinsic evidence may be admitted to permit an understanding of what reasonable persons in the parties' position would have meant by the contract terms. Here, the surrounding circumstances—which were not disputed—convinced the trial judge that the parties understood the extra payment clause to be a hedge against a transfer of ownership of the kind reflected in the sale to Zolfaghari. Having found the agreement unambiguous on this point, the judge was correct in declining to consider evidence that Christacos remained personally involved in the business despite the sale and hence satisfied Augur's basic concern. That evidence was not relevant to the agreement the parties had reached. *See Holland v. Hannan*, 456 A.2d 807, 815 (D.C.1983) (absent ambiguity, written contract, duly signed and executed, speaks for itself and binds the parties without the necessity of extrinsic evidence).

### III.

Appellant's remaining contention is that the trial judge erred in failing to find that the extra payment provision was an unenforceable penalty because the $50,000 figure bore "no reasonable relationship to foreseeable damages." *See Burns v. Hanover Insurance Co.*, 454 A.2d 325, 327 (D.C.1982) (as long as liquidated sum bears reasonable relation to damages foreseeable at time of contracting, clause is enforceable). The trial court rejected the premise of this argument, however, finding that the provision was not one for liquidated damages but rather was in the nature of a condition subsequent. That is, although the initial contract price was $300,000, when Christacos sold the restaurant he triggered a condition that increased the contract price by $50,000. We think that little turns in this case on whether the provision was a liquidated damages clause or a variant of a condition subsequent. As the trial judge noted, the provision bears scant resemblance to a liquidated damages clause in that Christacos would have been required to pay the additional $50,000 even if transfer of the business had been with Augur's consent. On the other hand, a condition subsequent normally *"divests* a duty of immediate performance of a contract after it has once accrued," 5 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 667 (3d ed. 1961) (emphasis added), and if anything, Christacos' duty under the clause appeared to be one that *arose* in the event he sold the business.[6] The point is academic, however, for if we treat the provision as one for liquidated damages, it clearly bore a reasonable relation—indeed was identical—to the figure by which the court found Augur had reduced the sales price as an inducement to Christacos to manage the restaurant personally. Alternatively, this court has enforced a price escalation clause of a contract increasing the price of commercial real estate to the highest per-square foot price subsequently paid by the buyers for lots in the same city block with the same frontage, *Dodek v. CF 16 Corp.*, 537 A.2d at 1095, and—without characterizing it as a condition subsequent—we see no reason why the instant duty triggered by a future sale of the business may not similarly be enforced.

### IV.

For the reasons stated, the judgment of the Superior Court is

*Affirmed.*

---

**6.** The distinction between a condition precedent and a condition subsequent was criticized long ago by Holmes in THE COMMON LAW 316–18 (1881), and commentators have noted the relative ease with which the one can be put in the form of the other. L. FULLER & R. BRAUCHER, BASIC CONTRACT LAW 635 (1964).