POTOMAC ELECTRIC POWER COMPANY, Plaintiff,

v.

MIRANT CORPORATION, Defendant.

Civil Action No. 02–178 (RMU).

United States District Court, District of Columbia.

March 11, 2003.

145

David Hensler, Hogan & Hartson, LLP, Washington, DC, for the Plaintiff.

Charles A. Zdebski, Troutman Sanders, LLP, Washington, DC, for the Defendant.

### MEMORANDUM OPINION

URBINA, District Judge.

DENYING WITHOUT PREJUDICE THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING WITHOUT PREJUDICE THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The plaintiff, Potomac Electric Power Company ("Pepco"), brings this claim for breach of contract against the defendant, Mirant Corporation ("Mirant"). On June 7, 2002, the two parties entered into the Asset Purchase and Sales Agreement ("Agreement") whereby Mirant purchased several of Pepco's power generating facilities and related assets. This dispute centers on whether the Agreement requires Mirant to assume liability and indemnify Pepco for expenses related to an asbestos-related lawsuit that was filed before December 19, 2000 (the Agreement's closing date) but did not name Pepco as a defendant until after December 19, 2000. This matter comes before the court on the parties' respective motions for summary judgment. For the reasons that follow, the court denies both motions without prejudice.

## II. BACKGROUND

Pepco is a District of Columbia corporation with its principal place of business in the District of Columbia. Compl. ¶ 1. Mirant is a Delaware corporation with its principal place of business in Atlanta, Georgia. Id. ¶ 2. On June 7, 2000, Pepco and Mirant entered into an Asset Purchase and Sale Agreement ("Agreement"). Pl.'s State-

ment of Undisputed Material Facts ("Pl.'s Statement") ¶¶ 1–2. Mirant agreed to purchase certain power generating facilities and related assets owned by Pepco in Maryland, Virginia and the District of Columbia, some of which the parties identified collectively as the "Auctioned Assets." Pl.'s Mot. for Summ. J. at 3. The Chalk Point generating facility ("Chalk Point"), located in Aquasco, Maryland, is one of the Auctioned Assets. Pl.'s Statement ¶ 2.

Under Section 2.3(a)[1] of the Agreement, the Assumed Obligations section, Mirant assumed all liabilities and obligations relating to the Auctioned Assets "from and after the closing" of the Agreement. *Id.* ¶¶ 2–4. The closing date of the Agreement is December 19, 2000. *Id.* ¶ 3. These liabilities and obligations include any environmental or personal injury liabilities arising out of the use or presence of hazardous substances, such as asbestos. *Id.* Furthermore, under Section 10.1(b)[2] of the Agreement, Mirant agreed to indemnify Pepco for any losses arising out of these liabilities and obligations. *Id.* ¶ 13.

Section 2.3(b) of the Agreement, the Retained Liabilities section, specifies that Pepco retained several categories of liabilities. *Id.* ¶ 7. Pepco's claim focuses on Section 2.3(b)(iii)(C) of the Agreement, which exempts Mirant from liability and indemnity obligations as they pertain to certain personal injury claims. Pl.'s Mot. for Summ. J. Ex. 1 at 9. Section 2.3(b)(iii)(C) reads:

*Retained Liabilities.* Buyer shall not assume or be obligated to pay, perform or otherwise discharge the following liabilities or obligations[:] . . . (C) any liability in respect of any personal injury claims relating to the exposure of a third party to asbestos at the Auctioned Assets or the Potomac River Station Site which have been filed with any state or federal court having jurisdiction prior to the Closing Date [December 19, 2000]. . . .

*Id.* In other words, under Section 2.3(b)(iii)(C), Pepco retained liability for personal injury claims related to asbestos exposure at the Auctioned Assets (including Chalk Point) and filed before December 19, 2000. *Id.*

In 2000, a number of asbestos-related personal injury claims, known as the CT–4 Cases, were pending in the Circuit Court for Baltimore City. Def.'s Statement of Undisputed Material Facts ("Def.'s Statement") ¶ 2. Pursuant to a February 17, 1987 order, the Circuit Court for Baltimore City consolidated into one trial cluster all personal injury asbestos cases in which the plaintiff was not a tradesman or steelworker and filed on or after January 1, 1987. *Id.* The master complaint in the CT–4 Cases, filed on March 20, 1987, served as the foundation for the allegations of fact and legal claims for this trial cluster. *Id.* For all subsequent cases, the Circuit Court for Baltimore City required prospective plaintiffs to file a short-form complaint that adopted and incorporated the relevant paragraphs of the master complaint. *Id.*

In November 1999, Alexander Wilson joined the CT–4 Cases by filing a short-

---

1. Section 2.3(a) of the Agreement states: *"Assumed Obligations.* At the Closing, Buyer shall assume, and from and after the Closing, shall discharge, all of the liabilities and obligations, direct or indirect, known or unknown, absolute or contingent, which relate to the Auctioned Assets . . . other than the Retained Liabilities. . . ." Pl.'s Mot. for Summ. J. Ex. 1 at 6.

2. Section 10.1(b) of the Agreement states: "Buyer will indemnify and hold harmless Seller . . . from and against any and all Indemnifiable Losses, as incurred, asserted against or suffered by any *Seller Indemnitee* relating to, resulting from or arising out of . . . (ii) the Assumed Obligations." Pl.'s Mot. for Summ. J. Ex. 1 at 46–47.

form complaint for personal injuries resulting from asbestos exposure ("Wilson Case"). *Id.* ¶ 3; Def.'s Mot. for Summ. J. Ex. F. Mr. Wilson's complaint requested relief in excess of $100 million and incorporated by reference "all Introductory Language and the Counts" set forth in the master complaint. *Id.* Mr. Wilson's complaint failed to allege specific facts or counts. Def.'s Statement ¶ 3.

In January 2001, after Mr. Wilson passed away, Mr. Wilson's estate filed an amendment to add Pepco as a defendant in the Wilson Case. *Id.* ¶ 5. Containing no additional allegations of fact, the amendment simply stated that Pepco was a defendant. *Id.* In March 2001, Mr. Wilson's estate filed an amended complaint elaborating on its theories of negligence, and then filed a second amended complaint in August 2001. *Id.* ¶ 5 n. 1; Def.'s Mot. for Summ. J. Exs. H, I. As Mirant concedes, not until the August 2001 second amended complaint did the Wilson Case make specific allegations about Pepco, reference Chalk Point, and connect Mr. Wilson to Chalk Point. *Id.* ¶ 5 n. 1. On December 14, 2001, the Circuit Court for Baltimore City granted Pepco's motion for summary judgment in the Wilson Case and dismissed all claims related to Pepco. *Id.; In re Asbestos Litig.,* 2001 WL 1757153 (Md.Cir.Ct. Dec.14, 2001).

In January 2001, Pepco called upon Mirant to indemnify Pepco for its expenses related to the Wilson Case. Pl.'s Statement ¶ 14. Since that time, Mirant has refused to indemnify Pepco. *Id.* ¶ 15. Pepco claims that it incurred more than $620,000 in "reasonable costs and expenses in preparation and defense of the Wilson Case." *Id.* ¶ 16. Consequently, Pepco filed a complaint seeking damages against Mirant in excess of $620,000, pre- and post-judgment interest, costs, and attorney's fees. Compl. ¶ 25. Pepco also asks for a declaratory judgment that Mirant is obligated to

indemnify Pepco for all indemnifiable losses. *Id.* ¶ 29.

In its motion for summary judgment, Pepco argues that under Section 2.3(a) of the Agreement, the Wilson Case constitutes an obligation that Mirant assumed because Mr. Wilson's estate did not file the amended complaint naming Pepco as a defendant until after the December 19, 2000 closing date of the Agreement. Pl.'s Mot. for Summ. J. at 2; Compl. ¶¶ 12, 16. Therefore, Pepco argues, Mirant must pay the costs of litigating the Wilson Case. In contrast, Mirant contends it need not pay these costs. In its motion for summary judgment, Mirant contends that Pepco retained liability for the Wilson Case pursuant to Section 2.3(b)(iii)(C) because the Wilson Case meets the requirements of this section and the original complaint in the Wilson Case was filed in 1999, before the December 19, 2000 closing date. Def.'s Cross–Mot. for Summ. J. at 10. Thus, Mirant asserts, it does not have to indemnify Pepco. *Id.*

## III. ANALYSIS

### A. Legal Standard for Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could

establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

### B. Legal Standard for Contract Interpretation

The court first determines that the applicable substantive law for the contract claims is the law of the District of Columbia. Next, the court discusses the contract law relating to ambiguity, reasonableness, and extrinsic evidence.

### 1. Applicable Contract Law

This court has jurisdiction over the parties based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Pepco is a District of Columbia corporation with its principal place of business in the District of Columbia, and Mirant is a Delaware corporation with its principal place of business in Atlanta, Georgia. Compl. ¶¶ 1–2. In Section 12.6 of the Agreement, the parties stipulated to resolving claims related to the Agreement under the substantive contract law of the District of Columbia. *Id.* ¶ 3. Consequently, the court analyzes Pepco's claims under District of Columbia contract law.

### 2. Ambiguity

■ In interpreting contractual terms, the court must adhere to the objective law of contracts, "whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress or mutual mistake." *Marra v. Papandreou*, 59 F.Supp.2d 65, 76 (D.D.C.1999), *aff'd* 216 F.3d 1119 (D.C.Cir.2000); *see also Patterson v. District of Columbia*, 795 A.2d 681, 683 (D.C.2002). Whether a contract is ambiguous is a question of law to be determined by the court. *Dist. No. 1—Pac. Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A.2d 269, 274 (D.C.2001); *Holland v. Hannan*, 456 A.2d 807, 815 (D.C.1983).

■ A contract is not ambiguous merely because the parties dispute its meaning or could have drafted clearer terms. *Dist. No. 1—Pac. Coast Dist.*, 782 A.2d at 274. Rather, a contract is ambiguous when it or its provisions are reasonably or fairly susceptible of different constructions or interpretations, or of two or

more different meanings. *Holland,* 456 A.2d at 815. Conversely, a contract is unambiguous when a court can ascertain the contract's meaning by merely looking at the contract. *Id.*

Considering the meaning of the term ambiguity, the court turns to a case where a tenant sued a cooperative association based upon its alleged failure to repair feeder pipes in her apartment. *1901 Wyoming Avenue Co-op. Ass'n v. Lee,* 345 A.2d 456 (D.C.1975). Whereas the tenant claimed the words "interior repairs" in her lease referred only to superficial or decorative work that an owner ordinarily might perform, the association argued that the "interior" of the apartment included the area just behind the plastered surface of the walls and ceiling, thus making the tenant responsible for the repairs. *Id.* at 460. Asserting that the contract was ambiguous on its face because "the word 'interior' as used in the contract was clearly open to several reasonable interpretations," the court concluded that a genuine issue of material fact existed and reversed the lower court's grant of summary judgment. *Id.* at 461.

A court generally will not grant summary judgment where a contract is ambiguous because its interpretation inevitably would "depend[ ] on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *Holland,* 456 A.2d at 815; *Atwood,* 43 F.3d at 1540. Conversely, summary judgment is appropriate where the contract is unambiguous since "absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Id.*

### 3. Reasonableness

■ In deciding whether contract language is susceptible of a clear meaning, the court conducts a reasonableness inqui-

ry. Toward that end, the court looks beyond the language itself and determines what a reasonable person in the position of the parties would have thought the disputed language meant. *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205 (D.C.1984). The court applies the reasonableness determination whether or not the contract's language appears ambiguous. *Patterson,* 795 A.2d at 683; *Fairfax Village Condo. VIII Unit Owners' Ass'n v. Fairfax Vill. Cmty. Ass'n, Inc.,* 726 A.2d 675, 677 n. 4 (D.C.1999).

In *1010 Potomac Associates,* the court held that the parties could not reasonably have intended the clause "option to expand" in a commercial lease to limit the tenant's right to exercise an option to lease additional space and then sublet that space for substantial profit. *1010 Potomac Assocs.,* 485 A.2d at 202, 206–07. As the court explained, "[a]n interpretation of the lease that so imperiled the security of commercial transactions dependent on it would not give reasonable and effective meaning to all the lease terms." *Id.* at 207.

■ Under the reasonableness approach, the court assumes that the objective reasonable person assessing the contract's language knows "all the circumstances before and contemporaneous with the making of the agreement." *Patterson,* 795 A.2d at 683; *Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982). The reasonable person is bound by all usages that either party knows or has reason to know. *Intercounty Constr. Corp.,* 443 A.2d at 32. The objective standard applies both to the circumstances surrounding the contract and the parties' course of conduct under the contract. *Id.* Finally, the court should look to the intent of the parties entering into the agreement. *Id.*

#### 4. The Use of Extrinsic Evidence

■ Courts should resort to extrinsic evidence of the parties' subjective intent only when the contract is ambiguous. *1010 Potomac Assocs.*, 485 A.2d at 205. The court may consider extrinsic evidence to determine the circumstances surrounding the making of the contract so as to ascertain what a reasonable person in the position of the parties would have thought the words meant. *Christacos v. Blackie's House of Beef, Inc.*, 583 A.2d 191, 194 (D.C.1990) (quoting *1010 Potomac Assocs.*, 485 A.2d at 205–06). Among the types of evidence that the court may consider are the circumstances before and contemporaneous with the making of the contract, all habitual and customary practices which either party knows or has reason to know, the circumstances surrounding the transaction, and the course of conduct of the parties to the contract. *Waverly Taylor, Inc. v. Polinger*, 583 A.2d 179, 182 (D.C. 1990).

#### C. The Court Denies Without Prejudice the Parties' Respective Motions for Summary Judgment

■ The court denies without prejudice the pending motions for summary judgment because Section 2.3(b)(iii)(C), the contract provision at issue, is reasonably susceptible to different interpretations and is therefore ambiguous. A court deeming a contract ambiguous generally will disfavor summary judgment because its interpretation of the contract likely would depend on a choice among reasonable inferences to be drawn from extrinsic evidence. *Holland*, 456 A.2d at 815. The court first sets forth the basis for its conclusion that the contract is ambiguous and then explains that it will consider extrinsic evidence.

#### 1. The Contract Provision at Issue is Ambiguous because it is Reasonably Susceptible to Different Interpretations

As stated previously, the disputed Section 2.3(b)(iii)(C) of the Agreement states:

*Retained Liabilities.* Buyer shall not assume or be obligated to pay, perform or otherwise discharge the following liabilities or obligations[:] . . . (C) any liability in respect of any personal injury claims relating to the exposure of a third party to asbestos at the Auctioned Assets or the Potomac River Station Site which have been filed with any state or federal court having jurisdiction prior to the Closing Date [December 19, 2000]. . . .

Pl.'s Mot. for Summ. J. Ex. 1 at 9. The dispute is whether Section 2.3(b)(iii)(C) requires that a complaint filed before December 19, 2000 specify that the personal injury claim is against Pepco. Here, Mr. Wilson filed his original complaint before December 19, 2000, but the complaint did not name Pepco as a defendant until after December 19, 2000, when Mr. Wilson's estate amended the complaint. Pepco argues that the Wilson case is not a Retained Liability as defined by Section 2.3(b)(iii)(C) because the provision requires that the claim name Pepco before the closing date. Mirant argues that the Wilson case is a Retained Liability as defined by Section 2.3(b)(iii)(C) because the provision is broad and includes any claim filed before December 19, 2000 that ultimately results in liability against Pepco, even if it does not name Pepco immediately.

Addressing the parties' arguments in further detail, the court first describes Pepco's contention that the drafters of the contract did not intend the phrase "any liability" in Section 2.3(b)(iii)(C) to broadly encompass claims unknown to Pepco as of the Agreement's closing date. Pl.'s Mot.

for Summ. J. at 12. Pepco states that defining "any liability" to include unknown, contingent or indirect claims against it would yield an absurd result that is "inconsistent with a reasonable interpretation of the contract." *Id.*

Pepco asserts that the parties "plainly knew how to address 'indirect ... unknown ... or contingent' liabilities when that was necessary." Pl.'s Opp'n at 5. Indeed, Section 2.3(a) (the Assumed Obligations clause) incorporates this language in stating that the buyer, Mirant, shall assume after the December 19, 2000 closing date "all of the liabilities and obligations, *direct or indirect, known or unknown, absolute or contingent,* which relate to the Auctioned Assets ... other than the Retained Liabilities." Pl.'s Mot. for Summ. J. Ex. 1 at 6 (emphasis added). To the contrary, Section 2.3(b) (the Retained Liabilities clause) does not contain language related to indirect, contingent or unknown liabilities and obligations. *Id.* According to Pepco, this omission is significant because the Wilson Case did not name Pepco as a defendant until the amended complaint filed after December 19, 2000, on January 9, 2001. Pl.'s Statement ¶ 5. Thus, a reasonable person in the position of the parties could have believed that the Retained Liabilities under Section 2.3(b)(iii)(C)—in contrast to Section 2.3(a)—would not include unknown, speculative, or contingent claims. *1010 Potomac Assocs.,* 485 A.2d at 205.

At the same time, the court considers persuasive Mirant's suggestion that Pepco's argument would only prevail if Section 2.3(b)(iii)(C) included the phrase "against Pepco." Def.'s Opp'n at 1. According to Mirant, the Wilson Case meets the five elements necessary to establish a Retained Liability as defined by Section 2.3(b)(iii)(C): (a) a personal injury claim; (b) relating to exposure of a third party to

asbestos; (c) at the Auctioned Assets; (d) filed with any court having jurisdiction; (e) prior to the closing date. Def.'s Opp'n at 3.

Thus, in its analysis as to whether the Wilson Case is a Retained Liability as defined by Section 2.3(b)(iii)(C), Pepco appears to subsume reference to a particular party—itself—into the five elements. But, as Mirant contends, "[w]hen read as a whole ... it is impossible for these terms to relate to parties because no parties are identified in the section." Def.'s Reply at 3. Moreover, as Mirant notes, "if Pepco had wanted to limit the Retained Liabilities to claims filed 'against Pepco,' it should have included such language." *Id.*

Both parties present reasonable arguments why the provision should have different meanings, thereby demonstrating that the contract provision at issue is reasonably susceptible to different constructions or interpretations. *Holland,* 456 A.2d at 815. Because Section 2.3(b)(iii)(C) is "open to several reasonable interpretations," it is ambiguous. *1901 Wyoming Avenue Co-op. Ass'n,* 345 A.2d at 461.

### 2. The Court Will Allow the Parties to Introduce Extrinsic Evidence

As explained *supra,* when a contract is ambiguous, the court can consider extrinsic evidence regarding the circumstances before and contemporaneous with the making of the contract, habitual and customary practices which either party knows or has reason to know, and the conduct of parties under the contract. *Waverly Taylor,* 583 A.2d at 182. Thus, in view of the ambiguity of Section 2.3(b)(iii)(C), the court will permit the parties to introduce extrinsic evidence. *Id.*

Thus far, Pepco has provided an affidavit from John J. Sullivan, the company's Associate General Counsel. Pl.'s Mot. for Summ. J. Ex. 2. Pepco relies on this ex-

trinsic evidence to show the "context in which the contract was formed" and to "permit a reasonable understanding of what reasonable persons in the parties' position would have meant by the contract terms." Pl.'s Reply at 4–5 n. 3. Mirant has not provided extrinsic evidence. Def.'s Opp'n at 4–5.

As courts already are reluctant to grant summary judgment where interpretation of a contract depends upon "a choice among reasonable inferences to be drawn from extrinsic evidence," this court will not grant summary judgment when only one party has provided extrinsic evidence. *Holland*, 456 A.2d at 815; *see also Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. At minimum, each party deserves the opportunity to present its own evidence as well as challenge the substance of the opposing party's extrinsic evidence. In order to do this, Mirant states that it must conduct discovery. Def.'s Reply at 4 n. 3. Accordingly, the court denies without prejudice the parties' respective motions for summary judgment and gives the parties an opportunity to conduct discovery.

## IV. CONCLUSION

For all these reasons, the court denies without prejudice both parties' motions for summary judgment. The court directs the parties to meet and confer and then submit a joint status report, accompanied by a proposed order, indicating to the court whether: (1) in light of this opinion, this case still can be resolved with dispositive motions; (2) the parties are willing to enter into settlement discussions; (3) the parties need to conduct discovery, and if so how much time the parties need to conduct discovery. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 11th day of March 2003.

### *ORDER*

Denying Without Prejudice the Plaintiff's Motion for Summary Judgment; Denying Without Prejudice the Defendant's Motion for Summary Judgment

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this 11th day of March 2003, it is

**ORDERED** that the plaintiff's motion for summary judgment is **DENIED without prejudice;** and it is

**FURTHER ORDERED** that the defendant's motion for summary judgment is **DENIED without prejudice;** and it is

**ORDERED** that no later than 45 days from the filing of this order the parties meet and confer and then submit a joint status report, accompanied by a proposed order, indicating to the court whether: (1) in light of this opinion, this case still can be resolved with dispositive motions; (2) the parties are willing to enter into settlement discussions; (3) the parties need to conduct discovery, and if so how much time the parties need to conduct discovery.

**SO ORDERED.**